Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:     516.741.4977
Facsimile:     516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE GOLDSTONE, on behalf of himself and those similarly situated, | Case No.: |
| Plaintiff, | CLASS ACTION |
| v. | CLASS ACTION COMPLAINT FOR: |
| PROGENICS PHARMACEUTICALS, INC., ANN MacDOUGALL, DAVID W. MIMS, GÉRARD BER, BRADLEY L. CAMPBELL, ERIC J. ENDE, KAREN JEAN FERRANTE, HEINZ MÄUSLI, LANTHEUS HOLDINGS, INC. and PLATO MERGER SUB, INC., | (1) Breach of Fiduciary Duties<br>(2) Aiding and Abetting<br>(3) Violation of § 14 (d) and 14(a) of the Securities Exchange Act of 1934<br>(4) Violation of § 20(a) of the Securities Exchange Act of 1934 |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff, George Goldstone ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Progenics Pharmaceuticals, Inc. ("Progenics" or the "Company"), against Progenics, the Company's Board of Directors (the "Board" or the "Individual Defendants"), Lantheus Holdings, Inc. and Plato Merger Sub, Inc. (collectively with Lantheus Holdings, Inc., "Lantheus") ("Lantheus," collectively with Progenics and the Board, the "Defendants") for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to Lantheus as a result of an unfair process for an unfair price, and to enjoin an upcoming stockholder vote on a proposed all stock transaction (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were originally memorialized in an October 1, 2019, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Original Merger Agreement"), and thereafter revised on a February 20, 2020, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Progenics will become an indirect wholly-owned subsidiary of Lantheus.  Progenics public stockholders will receive (i) 0.31 of a share of Lantheus Holdings common stock (the "Exchange Ratio") for each share of Progenics common stock they own, and (ii), a non-tradeable contingent value right ("CVR"), that is payable in two separate cash payments if PyL$^{TM}$ ($^{18}$F-DCFPyL), Progenics' prostate-specific membrane antigen targeted imaging agent designed to visualize prostate cancer currently in late stage clinical development ("PyL"), exceeds net sales thresholds of $100 million in 2022 and $150 million in 2023.

3.      Thereafter, on March 19, 2020, Progenics filed a proxy statement on schedule DEFM14A (the "Proxy Statement") with the SEC in support of the Proposed Transaction.[1]

4.      The dubious nature of the Proposed Transaction is laid bare considering the sharp drop in price of Lantheus' common stock that has resulted since the announcement of the deal Here, the Merger Agreement is composed largely of Lantheus common stock exchanged at a *fixed* exchange ratio of 0.31 which means that Progenics shareholders will receive 0.31 shares of Lantheus common stock for each of their shares, *regardless of Lantheus' stock price at the close of the Transaction*.  Thus, the consideration payable to Progenics shareholders is not insulated from fluctuations in Lantheus' stock price, and shareholders are left in the precarious position of not knowing whether the consideration payable to them will decline further.

5.      The failure of the Board to negotiate a collar to establish parameters to minimize the impact of stock price fluctuations on the value of the consideration payable to stockholders has proved extremely prejudicial to Progenics stockholders.  For example, Lantheus stock closed at $25.07 the day before the announcement of the Original Merger Agreement, implying a price of $6.27 for each share of Progenics at the then exchange ratio of 0.2502.  On March 18, 2020, however, Lantheus closed at $9.11, implying a price per share of only approximately $2.82 for Progenics, a significant drop in consideration despite the increase in exchange ratio from the Original Merger Agreement to the Merger Agreement.

6.      Perhaps most significantly, during the entirety of the sales process leading up to the entry into the Original Merger Agreement the Company was grappling with Velan Capital, L.P. ("Velan"), one of the largest stockholders of the Company, who had issued several letters and

---

[1] On November 12, 2012, Lantheus filed a registration statement on form S-4 (the "S-4") with the SEC in support of the Original Merger Agreement.

Consent Solicitations which was tantamount to a proxy fight with the then-Company Board. Velan was eventually successfully shortly after the Original Merger Agreement was entered into and succeeded in a bid to remove the previous Chief Executive Officer ("CEO") and Director Mark R. Baker of Progenics and two other Directors in favor of five (5) independent directors submitted by Velan. The new Board later re-negotiated the Proposed Transaction with Lantheus leading to the Merger Agreement.  However, it is unclear what affect this unfocused process had on the expenditure of Company assets and ability to get the best deal for stockholders in the Proposed Transaction.

7.     Despite Velan succeeding in its efforts to replace the Company Board due to, amongst other things, a failure to properly negotiate the Proposed Transaction in the best interest of the Company's stockholders, the new Board instituted after Velan's successful Consent Solicitation, subsequently failed to cure any of the issues present in the Proposed Transaction, and quite possibly ended up creating a situation wherein Progenics' stockholders are even worse off than under the Original Merger Agreement.

8.     Most notably, despite achieving a modest increase in the exchange ratio, the new Board failed entirely to ensure that this get from Lantheus actually translated into more consideration for Progenics' stockholders by again, failing to ensure that a collar was part of the Merger Agreement.  As mentioned throughout, this has resulted in stock compensation to Progenics stockholders that is *less than half the monetary value* proffered under the Original Merger Agreement, despite the increase in the exchange value obtained, due to Lantheus' precipitous drop in value and the failure to obtain a collar.

9.     While the new merger consideration also contains a CVR to be given to Progenics' stockholders, this in no way offsets the glaring issues with the stock-based component of the

Merger Consideration. This is due in large part to the fact that the CVR portion of the Merger Consideration has no guarantees of ever providing any money to Plaintiff and other members of the Class, as the CVR's payment in its entirety is contingent upon certain financial milestones being met by the post-close combined company. Moreover, even if these milestones are met, by the Merger Agreement's very terms, the actual consideration arising to holders of the CVR are unable to be determined at this time, creating a situation in which neither Plaintiff or the Class is able to render an informed decision on whether to vote for the Proposed Transaction.

10.    In addition, the Proposed Transaction is unfair and undervalued for a number of reasons. For example, the Company has traded as high as $6.37 per share within the past fifty-two weeks, and traded above $6.00 a share as recently as June 2019.

11.    Consensus analyst coverage over 6 months prior to the entry into the Original Merger Agreement had consistently placed a target price between $10.17-11.63 a share and BTIG Research has set an August 2019 price target of $14.00 a share.

12.    In further violation of their fiduciary duties, Defendants caused to be filed the materially deficient Proxy Statement on March 19, 2020 with SEC in an effort to solicit stockholders to vote their Progenics shares in favor of the Proposed Transaction. The Proxy Statement is materially deficient, deprives Progenics stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction, and is thus in breach of the Defendants fiduciary duties. As detailed below, the Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Progenics and Lantheus, provided to the Company's and Lantheus' financial advisors BofA Securities, Inc. ("BofA") and SVB Leerink LLC ("SCB Leerink"),

respectively, for use in their financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by BofA and SCB Leerink.

13.     In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Progenics without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or Lantheus without regard for Progenics' public stockholders.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Progenics stockholders.

14.     Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the breaches of fiduciary duties by Defendants.

## PARTIES & RELEVANT PERSONS

15.     Plaintiff is a citizen of Pennsylvania and, at all times relevant hereto, has been a Progenics stockholder.

16.     Defendant Progenics is an oncology company, develops, manufactures, and commercializes pharmaceutical products and other technologies to target, diagnose, and treat cancer in the United States and internationally. The company's product candidates include Azedra, a radiotherapeutic product candidate for the treatment of iobenguane scan positive, unresectable, and locally advanced or metastatic pheochromocytoma or paraganglioma for adult and pediatric

patients; PyL, a clinical-stage fluorinated prostate specific membrane antigen (PSMA)-targeted PET/CT imaging agent for prostate cancer; and 1095, a PSMA-targeted Iodine-131 labeled small molecule, which is in Phase II clinical trial for the treatment of metastatic castration-resistant prostate cancer. Its product candidates also comprise PSMA TTC, a thorium-227 labeled PSMA-targeted antibody therapeutic that is in Phase I clinical trial for treatment of metastatic prostate cancer; and Leronlimab, a humanized monoclonal antibody, which is in Phase III development for the treatment of HIV infection. The company also offers Relistor-subcutaneous injection for the treatment of opioid-induced constipation (OIC) in adults with chronic non-cancer pain or advanced-illness adult patients; Relistor tablets for the treatment of OIC in adults with chronic non-cancer pain; PSMA AI, an imaging analysis technology that uses artificial intelligence and machine learning to quantify and automate the reading of PSMA targeted imaging; and automated bone scan index, a software that quantifies the hotspots on bone scans and calculates the bone scan index value. It has license agreement with Salix Pharmaceuticals, Inc for the development and commercialization of Relistor worldwide; and Amgen Fremont, Inc to use its XenoMouse technology for generating human antibodies to PSMA. The Company was founded in 1986 and is based in New York City, New York and incorporated in Delaware.  Progenics is incorporated under the laws of the State of Delaware.  Its principal place of business is at One World Trade Center, 47th Floor, New York, New York 10007.  Shares of Progenics common stock are traded on the Nasdaq under the symbol "PGNX."

17.     Defendant Ann MacDougal is a Director of the Company Board and serves as the Interim Chair of the Company Board.  MacDougal was appointed to her position as Director on November 14, 2019 and as Interim Chair on November 15, 2019, as a result of Velan's October 8,

2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock.

18.     Defendant David W. Mims is a Director of the Company Board and serves as the Interim CEO of the Company.  Mims was appointed to his position as Director on November 14, 2019 and as Interim CEO on November 15, 2019, as a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock.

19.     Defendant Gérard Ber is a Director of the Company Board.  Ber was appointed to his position as Director on November 14, 2019, as a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock.

20.     Defendant Bradley L. Campbell has been a Director of the Company Board at all relevant times.

21.     Defendant Eric J. Ende is a Director of the Company Board.  Ende was appointed to his position as Director on November 14, 2019, as a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock.

22.     Defendant Karen Jean Ferrante has been a Director of the Company Board at all relevant times.

23.     Defendant Heinz Mäusli is a Director of the Company Board.  Mäusli was appointed to his position as Director on November 14, 2019, as a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock.

24.     Defendants identified in ¶¶ 17 - 23 are collectively referred to as the "Individual Defendants."

25.     Non-party Peter J. Crowley was a Director of the Company Board, and served as the Chair of the Company Board, prior to and during the sales process of the Proposed Transaction. As a consequence of Velan's "withhold the vote" campaign, Crowley did not receive the requisite number of votes to retain his Directorship at the July 11, 2019 Progenics Annual Meeting, and thereafter submitted his contingent resignation.   Crowley's contingent resignation became effective on October 17, 2019.

26.     Non-party Mark R. Baker was a Director  of  the  Company Board and served as Company CEO prior to and during the sales process of the Proposed Transaction. As a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock, Baker was removed from his positions as Director and CEO effective November 14, 2019.

27.     Non-party Michael D. Kishbauch was a Director of the Company Board during the sales process of the Proposed Transaction.  As a consequence of Velan's "withhold the vote" campaign, Kishbauch did not receive the requisite number of votes to retain his Directorship at the July 11, 2019 Progenics Annual Meeting, and thereafter submitted his contingent resignation. Kishbauch's contingent resignation became effective on October 17, 2019.

28.     Non-party David A. Scheinberg was a Director of the Company Board prior to and during the sales process of the Proposed Transaction. As a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock, Scheinberg was removed from his position as Director effective November 14, 2019.

29.     Non-party Nicole S. Williams was a Director of the Company Board prior to and during the sales process of the Proposed Transaction. As a result of Velan's October 8, 2019 Consent Solicitation, that was later approved on November 8, 2019 by a vote of 55% of outstanding shares of Progenics Common Stock, Williams was removed from her position as Director effective November 14, 2019.

30.     Defendant Lantheus develops, manufactures, and commercializes diagnostic medical imaging agents and products that assist clinicians in the diagnosis and treatment of cardiovascular and other diseases worldwide. Its principal products include DEFINITY, a microbubble contrast agent used in ultrasound exams of the heart; and TechneLite, a technetium generator that provides the nuclear material used in nuclear medicine procedures. The company also offers Xenon, a radiopharmaceutical gas used to assess pulmonary function, and to image cerebral blood flow; Neurolite, an injectable to identify the area within the brain where blood flow has been blocked or reduced due to stroke; Cardiolite, an injectable technetium-labeled imaging agent used in myocardial perfusion imaging (MPI) procedures to assess blood flow to the muscle of the heart; FDG, a fluorine-18-radiolabeled imaging agent to identify and characterize tumors in patients undergoing oncologic diagnostic procedures; and Cobalt (Co 57), a non-pharmaceutical radiochemical used in the manufacture of sources for the calibration and maintenance of single-photon emission computed tomography imaging cameras. In addition, it provides injectable radiopharmaceutical imaging agents, such as Thallium TI 201, which is used in MPI studies to detect cardiovascular disease; Gallium Ga 67 that is used to detect various infections and cancerous tumors; and Quadramet, a therapeutic product, which is used to treat severe bone pain associated with metastatic bone lesions. Further, the company is developing Flurpiridaz F 18, which is in Phase III clinical trials to assess blood flow to the heart; and LMI 1195 that is in Phase III clinical

trials for the diagnosis and treatment follow-up of neuroendocrine tumors. The company sells its products to radiopharmacies, integrated delivery networks, hospitals, clinics, and group practices. Lantheus Holdings, Inc was founded in 195, is headquartered in North Billerica, Massachusetts and incorporated in Delaware.

31.    Defendant Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

32.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

33.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Progenics' principal place of business is located in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Progenics common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes

Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

36. This action is properly maintainable as a class action for the following reasons.

a. The Class is so numerous that joinder of all members is impracticable. As of March 9, 2020, there were more than 86 million shares of Progenics common stock issued and outstanding, likely owned by hundreds if not thousands of non-affiliated Progenics public stockholders

b. There are questions of law and fact that are common to the Class, including:

i. Whether Defendants have violated federal securities laws;

ii. whether the Individual Defendants breached their fiduciary duties to the Class by entering into the Proposed Transaction, which is unfair to the Company's public stockholders and was entered into as a result of a flawed, inadequate and unfair process;

iii. whether the Proposed Transaction is unfair to the Class, in that the price is inadequate and unfair and does not reflect the fair value that could be obtained under the circumstances;

iv. whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by the Defendants; and

v. whether the Lantheus affiliated Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties;

c. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other Class members and Plaintiff has the same interests as the

other Class members. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

d. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

37.    To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and/or final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

38.    In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to act in the best interests of the company's shareholders, including the duty to obtain maximum value under the circumstances. To diligently comply with these duties, the directors may not take any action that:

a. adversely affects the value provided to the corporation's shareholder's;

b. will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

c. contractually prohibits them from complying with their fiduciary duties; and/or

13

      d.  will provide the directors, executives or other insiders with preferential treatment at the expense of, separate from, the public shareholders, and place their own pecuniary interests above those interests of the company and its shareholders.

39.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Progenics, are obligated to refrain from:

      a.  participating in any transaction where the directors' or officers' loyalties are divided;

      b.  participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the public shareholders of the corporation; and/or

      c.  unjustly enriching themselves at the expense or to the detriment of the public shareholders.

40.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public shareholders of Progenics, including their duties of loyalty, good faith, candor, and due care.  As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Progenics common stock in the Proposed Transaction.

41.    As a result of these breaches of fiduciary duty, the Company's public shareholders will not receive adequate or fair value for their common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

42.    Progenics is an oncology company, develops, manufactures, and commercializes pharmaceutical products and other technologies to target, diagnose, and treat cancer in the United States and internationally. The company's product candidates include Azedra, a radiotherapeutic product candidate for the treatment of iobenguane scan positive, unresectable, and locally advanced or metastatic pheochromocytoma or paraganglioma for adult and pediatric patients; PyL, a clinical-stage fluorinated prostate specific membrane antigen (PSMA)-targeted PET/CT imaging agent for prostate cancer; and 1095, a PSMA-targeted Iodine-131 labeled small molecule, which is in Phase II clinical trial for the treatment of metastatic castration-resistant prostate cancer. Its product candidates also comprise PSMA TTC, a thorium-227 labeled PSMA-targeted antibody therapeutic that is in Phase I clinical trial for treatment of metastatic prostate cancer; and Leronlimab, a humanized monoclonal antibody, which is in Phase III development for the treatment of HIV infection. The company also offers Relistor-subcutaneous injection for the treatment of opioid-induced constipation (OIC) in adults with chronic non-cancer pain or advanced-illness adult patients; Relistor tablets for the treatment of OIC in adults with chronic non-cancer pain; PSMA AI, an imaging analysis technology that uses artificial intelligence and machine learning to quantify and automate the reading of PSMA targeted imaging; and automated bone scan index, a software that quantifies the hotspots on bone scans and calculates the bone scan index value. It has license agreement with Salix Pharmaceuticals, Inc for the development and commercialization of Relistor worldwide; and Amgen Fremont, Inc to use its XenoMouse

technology for generating human antibodies to PSMA. The Company was founded in 1986 and is based in New York City, New York and incorporated in Delaware.

43.     On May 9, 2019, the Company released its First Quarter 2019 results.  Former CEO and Director Baker stated, "[w]e are excited to report that the U.S. commercial launch of AZEDRA for the treatment of advanced or metastatic pheochromocytoma and paraganglioma is proceeding well and as expected. We will record our initial AZEDRA revenues in the second quarter,"

44.     Additionally, with respect to the Company's pipeline cancer drugs, former CEO and Director Baker stated, "[w]e continue to partner with leading organizations worldwide, including Curium, in order to maximize the reach of our prostate cancer imaging agents and address unmet needs in the detection and therapeutic management of prostate cancer. We look forward to building on our positive momentum as we diligently execute our strategy to improve the lives of patients we serve and deliver value for our shareholders."

45.     On August 9, 2019, the Company released its Second Quarter 2019 results.  Former CEO and Director Baker commented, "[w]e are excited to report significant progress across our entire portfolio, with commercial, clinical, and business development achievements forming a strong foundation for near-term growth." "AZEDRA commercial dosing is underway and we are now focused on converting our growing number of treatment requests into treated patients. We are on our way to unlocking the significant value of this drug for both patients and our shareholders."

46.     Additionally, and as set forth in the successful Velan Consent Solicitation, a large percentage of shareholders believed that former CEO and Director Baker and the then-Board had squandered many value enhancing opportunities at the expense of shareholders.

47.     Unfortunately, as stated elsewhere herein, the Board constituted after Velan's successful Consent Solicitation did nothing to alleviate the damage done by the former Board, and

in fact, possibly reduced the compensation payable to Plaintiff and other public stockholders of Progenics.

48.     Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused Progenics to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

49.     As detailed in the Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, and was overshadowed and encompassed by the proxy challenge conducted and executed by Velan, in response to the Board's single-minded attempts to effectuate a sale of the Company to Lantheus.

50.     In fact, as early as February of 2019, Velan had made it clear privately and in various public statements that it believed the Company Board was leading the Company in the wrong direction, squandering opportunities for the Company, and failing to execute the sales campaigns of its flagship products correctly.

51.     Velan's eventual success in its near complete replacement of the Company Board in November of 2019 indicates that a majority of Company stockholders agreed with this position.

52.     However, rather than take seriously the myriad of concerns regarding the Company and its search for strategic alternatives, the Board and the Company marched forward towards its end-goal of a sale of the Company to Lantheus.

53.     In addition to wasting resources attempting to effectuate a strategic transaction whilst an ongoing proxy fight was waged by a sizable stockholder, the Company failed to properly engage in a sales process making it clear that its priorities were not in maximizing stockholder benefit, but rather in getting the sale to Lantheus done by any means necessary.

54.     For example, the Proxy Statement indicates that no independent committee of the Progenics board was created to run the sales process. In fact it is apparent that the sales process up until the entry into the Original Merger Agreement was run by the full Board, notably consisting of a majority of individuals who would later lose their Directorships as a result of the successful Consent Solicitation bid by Velan.

55.     The Proxy Statement also indicates that after the successful Consent Solicitation by Velan and the subsequent changeover of much of the Board, BofA was brought on to be the Company's financial advisor regarding the sales process moving forward, replacing Jefferies, L.L.C. which was the Company's original financial advisor for the sales process. However, the Proxy Statement does not give specific reasoning as to why this decision was made. Given that the Proxy Statement indicates that the Company will have paid BofA $3 million to serve as the Financial Advisor to the Company and that the S-4 filed by Lantheus regarding the Original Merger Agreement indicated that Jefferies was paid at least $2.25 million, and is possibly owed an additional $6.5 million, Plaintiff and the public stockholders of the Company are entitled to know the reasoning behind the seeming waste of several million dollars.

56.     In addition, it appears that only the most cursory of market checks was conducted by Jefferies and the Company in the lead up to the Original Merger Agreement, and included a reaching out to only five possible interested third parties, none of whom were financial entities. This is exacerbated by the fact that after taking over as financial advisor, BofA did not execute a market check of its own, instead, simply relying upon Jefferies' insufficiently small one done previously.

57.    It appears that thereafter, BofA conducted no market check of its own, simply relying on Jefferies' past actions.  No reason was given in the Proxy Statement as to why no subsequent market check was conducted.

58.    Finally, the Proxy Statement is unacceptably silent as to why in attempting to re-negotiate the Proposed Transaction after the changeover of the Board post Velan's successful Consent Solicitation, that the Board agreed to a large portion of the merger consideration consisting of an unguaranteed CVR, rather than a higher exchange ratio, cash, or any other form of consideration that was fully, or even partially, guaranteed.

59.    The Proxy Statement is also unclear as to the nature of all specific standstill restrictions arising out of the terms of any of the non-disclosure agreements entered into between Progenics on the one hand and either any interested third party, including Lantheus, or Velan, on the other, and if the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in any such agreements, and if so, the specific conditions, if any, under which such provisions would fall away.

60.    Moreover, the Proxy Statement is also unclear as to any differences that may exist between the various non-disclosure agreements entered into between Progenics and any interested third party, including Lantheus.

61.    It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

*The Proposed Transaction*

62.     On February 20, 20120 Progenics and Lantheus issued a press release announcing

the Proposed Transaction.  The press release stated, in relevant part:

> **NORTH BILLERICA, Mass. and NEW YORK** – February 20, 2020 – Lantheus
> Holdings, Inc. (NASDAQ: LNTH) ("Lantheus"), parent company of Lantheus Medical
> Imaging, Inc. ("LMI"), a leader in the development, manufacture and commercialization
> of innovative diagnostic imaging agents and products, and Progenics Pharmaceuticals, Inc.
> (NASDAQ: PGNX) ("Progenics"), an oncology company developing innovative
> medicines and artificial intelligence to find, fight and follow cancer, today announced that
> they have entered into an Amended and Restated Agreement and Plan of Merger (the
> "Amended Agreement") which amends the previously announced definitive Agreement
> and Plan of Merger dated as of October 1, 2019 (the "Original Agreement"). The Amended
> Agreement has been unanimously approved by the Boards of Directors of both companies.
>
> Under the terms of the Amended Agreement, Lantheus will acquire all of the issued and
> outstanding shares of Progenics common stock at a fixed exchange ratio whereby
> Progenics stockholders will receive, for each share of Progenics stock held at the time of
> the closing of the merger, 0.31 of a share of Lantheus common stock, increased from
> 0.2502 under the Original Agreement, together with a non-tradeable contingent value right
> ("CVR"). The CVR is payable in two separate cash payments if PyLTM (18F-DCFPyL),
> Progenics' prostate-specific membrane antigen targeted imaging agent designed to
> visualize prostate cancer currently in late stage clinical development ("PyL"), exceeds net
> sales thresholds of $100 million in 2022 and $150 million in 2023. As a result of the
> increase in the exchange ratio, following the completion of the merger, former Progenics
> stockholders' aggregate ownership stake will increase to approximately 40% of the
> combined company from approximately 35% under the terms set forth in the Original
> Agreement.
>
> Mary Anne Heino, President and Chief Executive Officer of Lantheus, said, "After
> continued integration planning with Progenics and close collaboration with Progenics'
> reconstituted Board of Directors, we are even more excited about the potential value we
> can unlock by combining our two businesses. We remain confident that together, we will
> create a platform that leverages Lantheus' long-standing expertise in complex
> manufacturing, supply chain and commercial excellence, with Progenics' three leading
> FDA approved products, clinical pipeline and development capabilities. Our team
> enthusiastically shares the view of Progenics stockholders in the long-term growth
> potential of the Progenics product portfolio and, with our complementary strengths, our
> combined company will be better able to serve patients and healthcare professionals across
> the continuum of critical diagnosis and care. We are also pleased with the progress the two
> companies have made toward closing throughout our discussions."

Gérard Ber, Ph.D. and Mr. Heinz Mäusli, two members of Progenics' reconstituted Board, will join the Lantheus Board upon closing. Lantheus will reduce its current ten member Board to nine members at its 2020 stockholders meeting, or sooner if this transaction closes before then. Lantheus will further reduce its Board to eight members at its 2021 stockholders meeting. As previously announced, the combined company will be led by Lantheus Chief Executive Officer Mary Anne Heino, who will be supported by Chief Financial Officer Robert J. Marshall Jr., CFA, and Chief Operations Officer John Bolla.

Brian Markison, Chairman of the Board of Lantheus, said, "We are excited about the additions of Dr. Ber and Mr. Mäusli to our board. Both Dr. Ber and Mr. Mäusli add experience in radiopharmaceuticals with deep manufacturing, operating, finance and compliance experience."

Ann MacDougall, Interim Chair of Progenics' Board, said, "We have been pleased to work with Lantheus on the amended merger agreement. The Progenics' Board has unanimously determined that the combination with Lantheus under the updated terms is in the best interest of our stockholders. The merger creates a stronger combined platform that offers an innovative and diversified diagnostic and therapeutics portfolio while ensuring stockholders the opportunity to participate in the future potential upside through enhanced ownership and the CVRs. The reconstituted Progenics Board, assisted by independent financial and legal advisors, has evaluated the business prospects and operations of Progenics as a stand-alone business as well as the value of the Progenics interest in the combined company under the revised terms in the merger transaction, and have concluded that the combination is the better path forward. We are also pleased to have our directors, Dr. Gérard Ber and Mr. Heinz Mäusli, join the Board of the combined company to enhance its prospects for future success."

David Mims, Interim CEO of Progenics, added, "We believe the combination will add significant value to both companies' stockholders, especially in light of the recent positive results we achieved with our PyL Phase 3 CONDOR trial and our product pipeline and research and development capabilities."

***The Inadequate Merger Consideration***

63.     Significantly, the Company's financial prospects and opportunities for future growth, and market presence for Lantheus establish the inadequacy of the merger consideration.

64.     First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company.  The proposed valuation does not adequately reflect the intrinsic value of the Company.  Moreover, the valuation does not adequately take into

consideration how the Company is performing, considering key financial improvements of the Company in recent years.

65.    For example, the Company has traded as high as $6.31 per share within the past fifty-two weeks, and traded above $6.00 a share as recently as June 2019.

66.    Additionally, consensus analyst coverage over the past 6 months has consistently placed a target price between $10.17-11.63 a share and BTIG Research has set an August 2019 price target of $14.00 a share.

67.    The inadequacy of the consideration offered under the Original Merger Agreement was a major factor behind Velan's successful Consent Solicitation that replaced most of the original Company Board.  However, despite the new Company Board being formed and the Merger Agreement's terms being modified to provide for a larger stock exchange ratio as part of the Merger Consideration, the total value being offered to Plaintiff and other public stockholders of the Company remains unacceptably low.

68.    This is evidenced most glaringly by the failure of either the original Board or the New Board to negotiate a collar to establish parameters to minimize the impact of stock price fluctuations on the value of the consideration payable to stockholders has proved extremely prejudicial to Progenics stockholders.  For example, Lantheus stock closed at $25.07 the day before the announcement of the Original Merger Agreement, implying a price of $6.27 for each share of Progenics at the then exchange ratio of 0.2502.  On March 18, 2020, however, Lantheus closed at $9.11, implying a price per share of only approximately $2.82 for Progenics, a significant drop in consideration despite the increase in exchange ratio from the Original Merger Agreement to the Merger Agreement.

69.     Moreover, the CVR portion of the Merger Consideration has no guarantees of off-setting this drop in price and providing adequate compensation for Plaintiff and other members of the Class, as the CVR's payment in its entirety is contingent upon certain financial milestones being met by the post-close combined company, and the actual consideration arising if said milestones are unable to be determined by Plaintiff or the Class at this time with adequate specificity to render an informed decision on whether to vote for the Proposed Transaction.

70.     In essence it is entirely possible that the total amount of compensation given to Plaintiff and other public stockholders of the Company will, in fact, decrease under the terms of the Merger Agreement as compared to those of the Original Merger Agreement, completely undercutting one of the core reasons for Velan's actions in submitting a Consent Solicitation to Progenics stockholders.

71.     Clearly, while the Proposed Transaction will be beneficial to Lantheus, it comes at great expense to Plaintiff and other public stockholders of the Company.

72.     It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Lantheus at the expense of Progenics public stockholders, which clearly indicates that Progenics stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

73.     The Merger Agreement contains certain provisions that unduly benefit Progenics by making an alternative transaction either prohibitively expensive or otherwise impossible. Notably, in the event of termination, the merger agreement requires Progenics to pay up to $18,340,000 to Lantheus if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, Progenics must pay this termination fee even if it consummates

any competing Superior Proposal (as defined in the Merger Agreement) *within 12 months following the termination* of the Merger Agreement.  The termination fee will make the Company that much more expensive to acquire for potential purchasers.  The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

74.     The Merger Agreement also contains a "No Solicitation" provision that restricts Progenics from considering alternative acquisition proposals by, *inter alia*, constraining Progenics' ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Takeover Proposal"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

75.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, the Individual Defendants agreed to provide to Parent and/or its affiliates information in order to match any other offer, thus providing Parent access to the unsolicited bidder's financial information and giving Parent the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Parent.

76.     Finally, the Merger Agreement does not include protections to ensure that the consideration payable to shareholders will remain within a range of reasonableness.  In a conventional stock-for-stock transaction, the parties customarily negotiate and implement a "floor" on the value of the consideration payable to stockholders, which establishes the lowest possible price payable.  In other cases, the parties limit the stock component of the consideration (and thus the volatility in the value of the consideration), by agreeing that the stockholders will

receive cash *and* stock in exchange for their shares.  Such transactions also often include a "collar," which establishes parameters that attempt to minimize the impact of stock price fluctuations on the value of the consideration payable to shareholders.  The Merger Agreement contains none of these protections.  Rather, the Merger Agreement contains a *fixed* exchange ratio of 0.31 which means that Progenics shareholders will receive 0.31 shares of Lantheus common stock for each of their shares, *regardless of Lantheus' stock price at the close of the Transaction*.  Thus, the consideration payable to Progenics shareholders is not insulated from fluctuations in Lantheus' stock price, and shareholders are left in the precarious position of not knowing whether the consideration payable to them will decline further.

77.     For example, Lantheus stock closed at $25.07 the day before the announcement of the Original Merger Agreement, implying a price of $6.27 for each share of Progenics at the then exchange ratio of 0.2502.  On March 18, 2020, however, Lantheus closed at $9.11, implying a price per share of only approximately $2.82 for Progenics, a significant drop in consideration despite the increase in exchange ratio from the Original Merger Agreement to the Merger Agreement.

78.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

79.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

*Potential Conflicts of Interest*

80.     The substantial interests of the Individual Defendants and other Company insiders themselves cannot be ignored.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for significant amounts of money upon the consummation of the Proposed Transaction as follows:

| Name of Beneficial Owner | Number of Shares of Common Stock Beneficially Owned[1] | Percentage Ownership |
|---|---|---|
| **Directors and Named Executive Officers** | | |
| Brian Markison | 86,462 | * |
| James Clemmer | 60,980 | * |
| Samuel Leno | 71,943 | * |
| Julie McHugh | 17,510 | * |
| Dr. Frederick Robertson | 43,062 | * |
| Dr. Derace Schaffer | 16,994 | * |
| Dr. James Thrall | 9,764 | * |
| Gary Pruden | 10,072 | * |
| Kenneth Pucel | 13,264 | * |
| Mary Anne Heino[2] | 383,482 | 1.0% |
| John Bolla[3] | 5,978 | * |
| Robert J. Marshall Jr.[4] | 3,324 | * |
| Michael P. Duffy[5] | 101,388 | * |
| All Directors and Named Executive Officers as a Group (13 persons)[6] | 824,223 | * |
| **5% Stockholders** | | |
| Blackrock, Inc.[7] | 6,058,429 | 15.3% |
| T. Rowe Price Associates, Inc.[8] | 3,183,805 | 8.1% |
| The Vanguard Group, Inc.[9] | 2,863,926 | 7.2% |

81.     Notably, as shown above, the Proxy Statement fails to include the monetary value of the stock ownership of the Company insiders.

82.     In addition, pursuant to the Merger Agreement, as a consequence of the Merger, each outstanding and unvested Company option and/or restricted stock will automatically vest and/or be converted into the right to receive cash or stock in certain amounts.  As a result, the

Individual Defendants will receive immediate lump sum cash payments in exchange for their (collective) thousands of currently illiquid Progenics options and restricted stock, as shown below:

| Name[1] | Number of In-the-Money Options (#) | Weighted Average Exercise Price of In-the-Money Options ($) | Number of Out-of-the-Money Options (#) | Weighted Average Exercise Price of Out-of-the-Money Options ($) |
|---|---|---|---|---|
| **Non-Employee Directors** | | | | |
| Ann MacDougall | 76,065 | 5.01 | — | — |
| Karen J. Ferrante | 80,000 | 4.59 | 90,000 | 7.13 |
| Gérard Ber | 56,393 | 5.01 | — | — |
| Heinz Mäusli | 56,393 | 5.01 | — | — |
| Bradley L. Campbell | 28,000 | 4.89 | 70,000 | 7.25 |
| Eric J. Ende | 56,393 | 5.01 | — | — |
| Peter J. Crowley | 165,000 | 4.71 | 258,749 | 7.49 |
| Michael D. Kishbauch | 40,000 | 4.68 | 126,591 | 6.89 |
| David A. Scheinberg | 60,000 | 4.71 | 120,000 | 7.07 |
| Nicole S. Williams | 60,000 | 4.71 | 120,000 | 7.07 |
| **Executive Officers** | | | | |
| David W. Mims | 56,393 | 5.01 | — | — |
| Mark R. Baker | — | — | — | — |
| Patrick Fabbio | 255,464 | 4.60 | 302,375 | 7.96 |
| Benedict Osorio | 172,964 | 4.64 | 100,000 | 6.62 |
| Asha Das | 207,214 | 4.64 | — | — |
| Bryce Tenbarge | 172,964 | 4.64 | 216,900 | 8.10 |
| Vivien Wong | 408,264 | 4.65 | 397,375 | 7.83 |

83.     Notably, the Proxy Statement only gives the "Weighted Average" price for each Company Insider's options, making it impossible to determine just how much consideration each insider will glean from the consummation of the Proposed Transaction.

84.     Furthermore, several Company insiders, are entitled to "golden parachute" awards should their employment with the Company be terminated due to a change-in-control, as would result from the consummation of the Proposed Transaction.  Said benefits are as follows:

| Named Executive Officer | Cash ($)[1] | Equity ($)[2] | Perquisites/ Benefits ($) | Tax Reimbursement ($) | Other ($) | Total ($) |
|---|---|---|---|---|---|---|
| David W. Mims | 0 | 800 | 0 | 0 | 0 | 800 |
| Mark R. Baker | 0 | 0 | 0 | 0 | 0 | 0 |
| Patrick Fabbio | 180,000 | 52,231 | 0 | 0 | 0 | 232,231 |
| Benedict Osorio | 180,000 | 52,231 | 0 | 0 | 0 | 232,231 |
| Asha Das | 180,000 | 68,376 | 0 | 0 | 0 | 248,376 |
| Vivien Wong | 180,000 | 52,231 | 0 | 0 | 0 | 232,231 |

85.     Moreover, as a result of the Proposed Transact, Defendants Ber and Mäusli will be given directorships with the surviving company, allowing them to reap additional employment related benefits that public Progenics stockholders will not be entitled to.

86.     Finally as a result of an agreement between Company Insider Executive Patrick Fabbio for Fabbio to "consult" during the transition phase immediately after the consummation of the Proposed Transaction, and entitle him to further monetary benefits not shared amongst public stockholders of Progenics.

87.     Based on the above, the Proposed Transaction is the product of an unfair and inadequate sales process conducted by the Board and Company insiders with an eye to personal compensation and in breach of its fiduciary duties and which fails to maximizer stockholder value.

***The Materially Misleading and/or Incomplete Proxy Statement***

88.     On March 19, 2020, the Defendants caused to be filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

89.     The Proxy Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Proxy Statement fails to disclose:

a.   The nature of any specific standstill restrictions arising out of the terms of any of the non-disclosure agreements entered into between Progenics on the one hand and either any interested third party, including Lantheus, or Velan, on the other, and if the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in any such agreements, and if so, the specific conditions, if any, under which such provisions would fall away;

b.   The nature of any differences that exist between the various non-disclosure agreements entered into between Progenics and any interested third parties, including Lantheus, or any other party, including Velan;

c.   The reasoning as to why no committee of disinterested directors was created to run the sales process;

d.   The specific reasoning as to why the both the original Board and the new Board agreed to forego any collar based upon the stock price of Lantheus at a point in time before the Merger Agreement had been entered into;

e.   The specific reasoning as to why the Board and Company agreed to a portion of the merger consideration taking the form of a unguaranteed CVR rather than an increase in the exchange ratio, cash, or some other form of guaranteed consideration;

f.   The specific reasoning as to why former Company financial advisor Jefferies was replaced with BofA, after Jefferies had already provided a fairness opinion regarding the Original Merger Agreement;

g.   Whether Jefferies is owed any additional money by the Company for its services rendered during the sales process, and if so the amount; and

h. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

*Omissions and/or Material Misrepresentations Concerning Progenics' Financial Projections*

90.    The Proxy Statement fails to provide material information concerning financial projections provided by Progenics' management and relied upon by BofA and SCB Leerink in their analyses.  The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.  The Proxy Statement indicates that in connection with the rendering of BofA fairness opinions, BofA reviewed "certain internal financial and operating information with respect to the business, operations and prospects of Progenics furnished to or discussed with BofA Securities by the management of Progenics, including certain probability-weighted financial forecasts relating to Progenics prepared by the management of Progenics." Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

91.    With respect to *Progenics Financial Projections*, the Proxy Statement fails to disclose:

    a.  All line items used to calculate:

        i.  Total Adjusted Net revenue

        ii.  Gross Profits, including the metrics of –

           1.  Cost of goods sold

        iii.  EBIT, including the metrics of -

           1.  Operating expenses

        iv.  Unlevered Free Cash Flow, including the metrics of -

           1.  taxes payable (including impact from NOLs),

           2.  potential future milestone payments to former stockholders of MIPI,

           3.  the change in net working capital,

           4.  capital expenditures,

           5.  depreciation and amortization

    b.  A reconciliation of all non-GAAP to GAAP metrics, including:

        i.  EBIT; and

        ii.  Unlevered Free Cash Flow

92.    The Proxy Statement also fails to account for and properly disclose the reason as to why differences exist between the *Progenics Financial Projections* included in the Proxy Statement and the purported same information included in the previously filed S-4.

93.    With respect to *Progenics Stand-Alone Financial Projections Developed by Lantheus Holdings Management*, the Proxy Statement fails to disclose:

    a.  All line items used to calculate:

        i.  Unlevered Free Cash Flow, including the metrics of -

1. earnings

2. income taxes,

3. interest and amortization,

4. income tax expenses,

5. depreciation,

6. changes in working capital,

7. capital expenditures

b.  A reconciliation of all non-GAAP to GAAP metrics, including:

i.  Unlevered Free Cash Flow

94.     The Proxy Statement also fails to account for and properly disclose the reason as to why differences exist between the *Progenics Stand-Alone Financial Projections Developed by Lantheus Holdings Management* included in the Proxy Statement and the purported same information included in the previously filed S-4

95.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

96.     Without accurate projection data presented in the Proxy Statement, Plaintiff and other stockholders of Progenics are unable to properly evaluate the Company's true worth, the accuracy of BofA's or SCB Leerink's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning Lantheus' Financial Projections*

97.    The Proxy Statement fails to provide material information concerning financial projections provided by Lantheus management and relied upon by BofA and SCB Leerink in their analyses.  The Proxy Statement discloses management-prepared financial projections for Lantheus which are materially misleading.  The Proxy Statement indicates that in connection with the rendering of BofA's fairness opinion, BofA reviewed "certain internal financial and operating information with respect to the business, operations and prospects of Lantheus Holdings furnished to or discussed with BofA Securities by the management of Progenics, including certain financial forecasts relating to Lantheus Holdings prepared by the management of Progenics."  Moreover, the Proxy Statement indicates that in connection with the rendering of SCB Leerink's fairness opinion, SCB Leerink reviewed, "certain financial forecasts and other information and data relating to each of Lantheus Holdings and Progenics prepared by management of Lantheus Holdings and furnished to us by Lantheus Holdings for purposes of SVB Leerink's analysis."  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

98.    With respect to the *Lantheus Holdings Financial Projections Prepared by Progenics Management* financial projections, the Proxy Statement fails to disclose:

    a.   All line items used to calculate:

        i.   Gross Profit, including the metric of –

          1. Cost of goods sold

      ii. EBIT, including the metrics of -

          1. Total operating expenses

      iii. Unlevered Free Cash Flow, including the metrics of -

          1. taxes payable (including impact from NOLs),

          2. the change in net working capital,

          3. capital expenditures,

          4. depreciation and amortization

   b. A reconciliation of all non-GAAP to GAAP metrics, including:

      i. EBIT; and

      ii. Unlevered Free Cash Flow

99.    The Proxy Statement also fails to account for and properly disclose the reason as to why differences exist between the *Lantheus Holdings Financial Projections Prepared by Progenics Management* included in the Proxy Statement and the purported same information included in the previously filed S-4.

100.    With respect to the *Lantheus Holdings Financial Projections* financial projections, the Proxy Statement fails to disclose:

   a. All line items used to calculate:

      i. Adjusted EBITDA, including the metric of –

          1. net income (loss),

          2. interest expense (net),

          3. income taxes,

          4. stock compensation,

5. financing charges and

6. certain items and other adjustments required or permitted in calculating Adjusted EBITDA under the agreements governing Lantheus Holdings' long-term debt facilities including asset write offs, severance and recruitment, new manufacturing costs and other one-time non-recurring charges

   ii. Unlevered Free Cash Flow, including the metrics of -

1. income taxes,

2. interest,

3. income tax expenses,

4. changes in working capital,

b. A reconciliation of all non-GAAP to GAAP metrics, including:

   i. Adjusted EBITDA; and

   ii. Unlevered Free Cash Flow

101. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

102. Without accurate projection data presented in the Proxy Statement, Plaintiff and other stockholders of Progenics are unable to properly evaluate the Lantheus' true worth, the accuracy of BofA's or SCB Leerink's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction. As such, the Board has breached their fiduciary duties by failing to include such information in the Proxy Statement.

35

*Omissions and/or Material Misrepresentations Concerning the Combined Company's*
*Financial Projections*

103.    The Proxy Statement fails to provide material information concerning financial projections for the combined company provided by Lantheus management and relied upon by BofA and SCB Leerink in their analyses.  The Proxy Statement discloses management-prepared financial projections for the combined company which are materially misleading.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007)

104.    With respect to the *Lantheus Holdings Combined Company Projections* financial projections, the Proxy Statement fails to disclose:

    a.   All line items used to calculate:

        i.   Adjusted EBITDA, including the metric of –

            1.   net income (loss),

            2.   interest expense (net),

            3.   income taxes,

            4.   stock compensation,

            5.   financing charges and

            6.   certain items and other adjustments required or permitted in calculating Adjusted EBITDA under the agreements governing Lantheus Holdings' long-term debt facilities including asset write offs, severance and recruitment, new manufacturing costs

36

and other one-time non-recurring charges, taking into account the potential impact of the Lantheus Holdings projected synergies

b.  A reconciliation of all non-GAAP to GAAP metrics, including:

i.  Adjusted EBITDA.

105.   The Proxy Statement also fails to account for and properly disclose the reason as to why differences exist between the *Lantheus Holdings Combined Company Projections* included in the Proxy Statement and the purported same information included in the previously filed S-4.

106.   This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

107.   Without accurate projection data presented in the Proxy Statement, Plaintiff and other stockholders of Progenics are unable to properly evaluate the potential combined company's true worth, the accuracy of BofA's or SCB Leerink's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by BofA*

108.   In the Proxy Statement, BofA describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for,

underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

109.    With respect to the *Selected Publicly Traded Companies Analysis* for Progenics, the Proxy Statement fails to disclose the following:

    a.   The specific benchmark multiples for each comparable company.

110.    With respect to the *Discounted Cash Flow Analysis* for Progenics, the Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumptions used to calculate the perpetuity growth rates of (10.0)% to 0.0%;

    b.   The specific inputs and assumptions used to calculate the discount rate range of 10.50% to 14.00%; and

    c.   The estimated present value of the NOLs that Progenics management forecasted would be utilized during calendar years 2019 through 2033 and the inputs and assumptions used to calculate the discount rate of 10.5% to 14.0%

111.    With respect to the *Selected Publicly Traded Companies Analysis* for Lantheus, the Proxy Statement fails to disclose the following:

    a.   The specific benchmark multiples for each comparable company.

112.    With respect to the *Discounted Cash Flow Analysis* for Lantheus, the Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumptions used to calculate the perpetuity growth rates of 1.25% to 2.25%;

    b.   The specific inputs and assumptions used to calculate the discount rate range of 7.75% to 10.00%; and

    c.   The estimated present value of the NOLs that Lantheus Holdings management forecasted would be utilized during calendar years 2019 through 2024 and the inputs and assumptions used to calculate the discount rate of 5.0% to 7.0%;

113.    These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by SVB Leerink*

114.    In the Proxy Statement, SVB Leerink describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

115.    With respect to the *Discounted Cash Flow Analysis* for Lantheus, the Proxy Statement fails to disclose the following:

    a.   The specific inputs and assumptions used to calculate the perpetuity growth rates of 0.0% to 1.0%;

    b.   The specific inputs and assumptions used to calculate the discount rate range of 8.0% to 10.0%, including Lantheus' weighted average cost of capital;

    c.   The stand-alone, unlevered, after-tax free cash flows that Lantheus Holdings was forecasted to generate from December 31, 2019 through fiscal year 2023, based on the Lantheus Management Projections;

    d.   The terminal values calculated; and

e.   Lantheus Holdings' available net operating loss carryforwards and other tax attributes.

116.   With respect to the *Sum-of-the-Parts Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose the following:

a.   The specific inputs and assumptions used to calculate the perpetuity growth rates of (10.0%) to 0.0%;

b.   The specific inputs and assumptions used to calculate the discount rate range of 10.0% to 12.0%, including Progenics' weighted average cost of capital;

c.   The stand-alone, unlevered, after-tax free cash flows that Progenics was forecasted to generate from December 31, 2019 through fiscal year 2036, based upon the Lantheus Management Projections;

d.   The terminal values calculated; and

e.   Progenics' available net operating loss carryforwards and other tax attributes.

117.   These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

118.   Without the omitted information identified above, Progenics' public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.   Moreover, without the key financial information and related disclosures, Progenics' public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.   As such, the Board has breached their fiduciary duties by failing to include such information in the Proxy Statement.

# FIRST COUNT

### Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

119.    Plaintiff repeats all previous allegations as if set forth in full herein.

120.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

121.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Progenics.

122.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Progenics by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Progenics to its public stockholders.

123.    Indeed, Defendants have accepted an offer to sell Progenics at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

124.    Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

125.    The Individual Defendants dominate and control the business and corporate affairs of Progenics, and are in possession of private corporate information concerning Progenics' assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Progenics which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

41

126.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

127.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Progenics' assets and have been and will be prevented from obtaining a fair price for their common stock.

128.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

129.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Aiding and Abetting the Board's Breaches of Fiduciary Duty**
**Against Defendants Progenics, Lantheus, and Merger Sub**

130.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

131.    Defendants Progenics, Lantheus and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

132.    As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

133.    Plaintiff and the members of the Class have no adequate remedy at law.

**THIRD COUNT**

**Violations of Section 14(a) of the Exchange Act**
**Against All Defendants**

134.    Plaintiff repeats all previous allegations as if set forth in full herein.

135.    Defendants have disseminated the Proxy Statement with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

136.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

137.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

138.    The Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that

the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

139.   The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

140.   The Individual Defendants were at least negligent in filing a Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Proxy Statement not misleading.

141.   The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to vote their shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

142.   Plaintiff repeats all previous allegations as if set forth in full herein.

143.   The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Company stockholders.

144.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Proxy Statement.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

145.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Progenics' business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Proxy Statement was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

146.    The Individual Defendants acted as controlling persons of Progenics within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Progenics to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Progenics and all of its employees.  As alleged above, Progenics is a primary violator of Section 14 of the Exchange Act

and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.     Enjoining the Proposed Transaction;

C.     In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.     Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E.     Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Progenics and obtain a transaction which is in the best interests of Progenics and its stockholders;

F.     Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.


Dated: April 2, 2020                     BRODSKY & SMITH, LLC


                              By: *Evan J. Smith*
                              Evan J. Smith
                              240 Mineola Boulevard
                              Mineola, NY  11501
                              Phone:  (516) 741-4977
                              Facsimile (561) 741-0626

                              *Counsel for Plaintiff*